**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JACKIE DITTY, | ) | CASE NO. 1:24-CV-01412-JDA |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | JENNIFER DOWDELL |
| | ) | ARMSTRONG |
| LELAND DUDEK, | ) | |
| ACTING COMMISSIONER OF | ) | **MEMORANDUM OPINION** |
| SOCIAL SECURITY,[1] | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

## I.      INTRODUCTION

Plaintiff Jackie Ditty ("Ms. Ditty") seeks judicial review of the final decision of the Commissioner of Social Security denying her application for disability insurance benefits ("DIB"). This matter is before me pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). The parties have consented to the jurisdiction of this Court pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1. (ECF No. 7). For the reasons set forth below, the Court REMANDS the case to the Commissioner for further proceedings consistent with this memorandum opinion and order.

## II.     PROCEDURAL HISTORY

On May 14, 2018, Ms. Ditty filed her application for DIB. (Tr. 687). Ms. Ditty's application related to her depression, anxiety, post-traumatic stress disorder, herniated disc, arthritis in the spine, migraines, plantar fasciitis, diverticulitis, overactive bladder, and leaking of

---

[1] Ms. Ditty named Martin O'Malley, the Commissioner of Social Security at the time she filed her complaint, as the defendant in this action. Mr. O'Malley resigned as Commissioner of Social Security in November 2024. Leland Dudek is currently serving as Acting Commissioner.

the bowel. (Tr. 762).

The Social Security Administration ("SSA") denied Ms. Ditty's application initially and upon reconsideration. (Tr. 392, 407). Ms. Ditty requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 481). The ALJ held a hearing on August 30, 2019, at which Ms. Ditty was represented by counsel. (Tr. 328). Ms. Ditty testified, as did an impartial vocational expert ("VE"). On September 19, 2019, the ALJ issued a written decision finding that Ms. Ditty was not disabled. (Tr. 408).

On September 9, 2020, the Appeals Council vacated the ALJ's decision and remanded the case to the ALJ for further proceedings. (Tr.  428). The Appeals Council held that the ALJ failed to adequately evaluate the nature and severity of Ms. Ditty's respiratory impairments and also failed to impose any limitations based on Ms. Ditty's urinary incontinence, despite finding that her urinary incontinence constituted a severe impairment. (Tr. 430).

On January 29, 2021, the ALJ held a second hearing. (Tr. 296). Ms. Ditty again testified, as did a VE. *Id*. On June 15, 2021, the ALJ issued a written decision, again finding that Ms. Ditty was not disabled. (Tr. 435). On June 21, 2022, the Appeals Council again vacated the ALJ's decision and remanded for further proceedings. (Tr. 456). The Appeals Council held that the ALJ failed to follow the Appeals Council's prior remand order because the ALJ failed to properly evaluate whether Ms. Ditty's respiratory impairments met or equaled Listings 3.02 and 3.03, despite evidence showing that Ms. Ditty's respiratory functioning had worsened. (Tr. 457). The Appeals Council directed that a medical consultant be obtained to evaluate whether Ms. Ditty met or equaled a listing. *Id*. The Appeals Council also held that the ALJ failed to include a policy compliant analysis under Social Security Ruling ("SSR") 96-8p or SSR 16-3p regarding Ms. Ditty's subjective allegations. (Tr. 458). In addition, the Appeals Council held that the ALJ did not adequately evaluate all of the prior administrative medical findings or the opinion of one of

Ms. Ditty's treating medical sources, Tyecia Stevens, APRN-CNP. *Id*. Finally, the Appeals Council also ordered that the matter be assigned to a new ALJ on remand. (Tr. 459).

On May 10, 2023, the newly-assigned ALJ held another hearing. (Tr. 249). Ms. Ditty testified, as did a VE and an independent medical expert, Alan Goldstein, M.D. *Id*. On July 5, 2023, the ALJ issued a written decision finding that Ms. Ditty is not disabled. (Tr. 214). The ALJ's decision became final on July 2, 2024, when the Appeals Council declined further review. (Tr. 1).

On August 20, 2024, Ms. Ditty filed her complaint, challenging the Commissioner's final decision. (ECF Doc. No. 1). Ms. Ditty asserts the following assignments of error:

(1) The ALJ erred by improperly discrediting the medical expert and limiting his medical expertise only to pulmonology, and then failed to properly evaluate not only the expert testimony but other treating providers opinions.

(2) The ALJ improperly discredited the claimant's reports of symptoms, specifically pain, dyspnea and incontinence, resulting in an inaccurate residual functional capacity of the plaintiff.

(3) The ALJ erred in failing to find that a rollator walker was medically necessary.

(ECF No. 9-1, PageID # 2857, 2860, 2862).

## III.    BACKGROUND

### A.    Personal, Educational, and Vocational Experience

Ms. Ditty was born in 1976 and was 41 years old on the date of her application. (Tr. 687). She graduated high school and attended some college. (Tr. 763). Ms. Ditty has prior work experience as a parking lot manager and a display manager at Target. (Tr. 336, 763).

### B.    Relevant Hearing Testimony

#### 1.    Ms. Ditty's Testimony

At the August 30, 2019 hearing, Ms. Ditty testified to ongoing problems with her spine, bladder, and lungs. (Tr. 337). Ms. Ditty testified that she recently underwent an MRI, which revealed herniated discs and spinal degeneration from arthritis. (Tr. 338). She testified that her body locks up easily and that she sometimes needs the assistance of her mother or her daughter to

get out of bed. *Id*. Ms. Ditty testified that she is not able to go shopping without taking a break, and that she has used a walker for over a year. (Tr. 346). She further testified that she was falling once or twice per month before she got the walker. (Tr. 347). She testified that she uses her walker every day, both inside and outside the home, and that she also has rails in her house. (Tr. 348). She testified that she cannot walk on her toes or tandem walk. (Tr. 350).

With respect to her bladder issues, Ms. Ditty testified that she receives Botox injections every six to eight months due to incontinence. (Tr. 339). She testified that her last injection was eight months ago. *Id*. She testified that the injections are effective for anywhere from six to twelve months, but that she needs insurance approval before she can get another injection. (Tr. 340). She also testified that she wears protective undergarments every day and that she needs to change them approximately ten times per day. *Id*. Ms. Ditty likewise testified that she has gastrointestinal issues, which result in her having diarrhea all day long. (Tr. 342). She testified that she uses the restroom upwards of 30 times per day. *Id*. She testified that, between her bladder and gastrointestinal issues, there have been zero days in the past year where she went to the restroom fewer than 30 times. (Tr. 344).

With respect to her lungs, Ms. Ditty testified that her COPD has gotten worse and that her breathing function is at 35%. (Tr. 341). She testified that she has been dealing with an infection for three months that she is struggling to get rid of. *Id*. She also testified that she cannot walk long distances without sitting, and that she tries to avoid malls and other similar places. *Id*. She further testified that she gets migraines a couple times per week. *Id*.

Ms. Ditty testified that she has a drivers' license and that she drives to the grocery store and to Walmart. (Tr. 335). On a typical day, she will lay on a heating pad for a few hours a day and will also lay on cool pads. (Tr. 342). She testified that she does not do any household chores and that she no longer has hobbies. (Tr. 343).

4

At the January 29, 2021 hearing, Ms. Ditty testified that she was diagnosed with celiac disease in November 2020. (Tr. 304-05). She testified that her bowel leakage began getting worse nine months ago. (Tr. 305). She also testified that her pain and COPD had worsened, and that the doctors had increased the dosages on her medications. *Id*. She testified that she spends most of her day in the bathroom as a result of her bladder and gastrointestinal issues. (Tr. 306-07).

Ms. Ditty testified that she has arthritis in her spine and herniated discs, which make it difficult for her to bend over. (Tr. 311). She testified that the pain is in her lower back and radiates down her leg. (Tr. 312). She testified that she fell seven times in the previous few months and that the frequency of her falls is increasing. (Tr. 312). She also testified that she uses a cane and a walker. *Id*. She further testified that she is beginning to experience pain on her right side because she puts more weight on that side to compensate for her left side. *Id*. She testified that her pain is constant and usually rates as a six or seven out of ten, but that it is above a seven approximately 15 days per month. (Tr. 313). When the pain is greater, she does not get out of bed except to use the bathroom. *Id*. She testified that she has to change positions every 15 minutes when she is sitting and that she can stand for approximately five to ten minutes. (Tr. 314). She also testified that she cannot walk more than 400 feet. (Tr. 315).

At the May 10, 2023 hearing, Ms. Ditty testified that she has a rollator walker, a cane, and an electric wheelchair, although she cannot afford to use the electric wheelchair. (Tr. 274). She testified that she began using a rollator walker before 2020. (Tr. 275). She testified that when she goes to the doctor's office, someone drives her, and she uses a wheelchair. *Id*. She also testified that she uses her walker around the home. (Tr. 274). She testified that she always has a wheelchair available when she leaves the house. *Id*.

Ms. Ditty testified that her back condition has worsened since the prior hearings. (Tr. 275). She also testified that her bladder issues have not changed over the past year, but that her breathing

issues are much worse. *Id*. She testified that she had an appointment scheduled for June to determine if she would be placed on oxygen. *Id*. She also testified that she has celiac disease and fibromyalgia. *Id*. She said that, in 2020, she was using the bathroom 40 times per day as a result of her diarrhea. (Tr. 276).

2.    ***Testimony of Alan Goldstein, M.D.***

Dr. Goldstein was the independent medical expert that the ALJ retained pursuant to the Appeals Council's second remand order. With respect to Ms. Ditty's respiratory issues, Dr. Goldstein testified that Ms. Ditty displayed reversibility because she saw significant improvement with a bronchodilator. (Tr. 257). Dr. Goldstein also testified that Ms. Ditty did not meet the requirements of Listing 3.02 with respect to her COPD and did not meet the requirements of Listing 3.03 with respect to her asthma. (Tr. 260). However, Dr. Goldstein also testified Ms. Ditty has a significant back problem which, in his opinion, medically equals the criteria of Listing 1.15, and that it is complicated by symptoms of asthmatic bronchitis. (Tr. 261).

With respect to her respiratory functioning, Dr. Goldstein opined that Ms. Ditty should avoid any types of irritants, particularly glues, fumes, and cleaning products. (Tr. 271). He also testified that Ms. Ditty should avoid temperature extremes and unprotected heights, and that she is limited in the extent to which she can climb stairs or ramps. *Id*. He opined that, in light of her back problems, Ms. Ditty should not stand or walk for more than two to three hours in a workday, and that she would need to alternate between sitting and standing every 45 to 60 minutes. (Tr. 272). He also opined that she may need more breaks than usual and that the job should not involve kneeling, crawling, or bending. (Tr. 272). He further testified that she should not climb more than one set of stairs and should not climb ramps or be exposed to unprotected heights. *Id*.

The ALJ found that Dr. Goldstein's opinions were generally persuasive with respect to Ms. Ditty's pulmonary limitations but were unpersuasive with respect to her back condition. (Tr. 236).

### 3.    *Vocational Expert's Testimony*

The ALJ asked the VE to consider an individual with Ms. Ditty's characteristics who was limited to light work and who could occasionally climb ramps and stairs; could never climb ladders, ropes, or scaffolds; could occasionally stoop; could frequently kneel, crouch, and crawl; should never work around unprotected heights or operate dangerous machinery; could occasionally work around humidity, wetness, pulmonary irritants, extreme cold or heat; could understand, remember, and carry out instructions for work tasks that do not involve production rate pace environments; and could adapt to occasional changes in work duties. (Tr. 286). The VE testified that the hypothetical individual could perform Ms. Ditty's past work as a display manager but not her past work as a parking lot supervisor. *Id*.

The ALJ next asked the VE if the hypothetical individual could perform Ms. Ditty's past work if the hypothetical individual could only occasionally stoop, kneel, or crouch and must avoid frequent exposure to humidity, wetness, pulmonary irritants, extreme cold and extreme heat. (Tr. 287). The VE testified that the hypothetical individual could still perform Ms. Ditty's past work as a display manager. *Id*. The VE similarly testified that the hypothetical individual could perform Ms. Ditty's past work as a display manager if she needed to avoid all exposure to humidity, wetness, pulmonary irritants, extreme cold, and extreme heat. (Tr. 287-88). The VE also testified that the hypothetical individual could perform Ms. Ditty's past work as a display manager if the individual needed to stand or walk every 60 minutes. (Tr. 288-89).

The ALJ next asked if the hypothetical individual could perform Ms. Ditty's past work if the hypothetical individual could stand and walk for a maximum of four hours and could sit for a maximum of four hours and would need to alternate between standing and walking over the course of the workday. (Tr. 288-89). The VE testified that the hypothetical individual could perform Ms. Ditty's prior work as a display manager but not as a parking lot supervisor. (Tr. 282). Finally, the

VE testified that the individual could not perform Ms. Ditty's past work if the individual were limited to sedentary activity, but could perform work as a charge account clerk, telephone quote clerk, or document preparer. (Tr. 293-94).

In response to a question from Ms. Ditty's counsel, the VE testified that the hypothetical individual could not perform Ms. Ditty's past work or other jobs existing in the national economy if she needed to use a rolling walker for ambulation. (Tr. 289-90). The VE likewise testified that the individual could not perform Ms. Ditty's past work or other work existing in the national economy if the individual needed to use the bathroom for ten minutes or more per hour. (Tr. 291). The VE further testified that it would be work-preclusive if the individual needed additional breaks totaling an additional 30 minutes over the course of a workday. (Tr. 292).

### C.  <u>Relevant Opinion Evidence[2]</u>

#### 1.  *Tyecia Stevens*, *APRN-CNP*

On September 6, 2018, Nurse Stevens, one of Ms. Ditty's treating providers, completed a medical source statement regarding Ms. Ditty's physical capacity. (Tr. 1226). Nurse Stevens opined that Ms. Ditty suffered from degenerative disc disease and facet arthropathy. *Id*. Nurse Stevens stated that Ms. Ditty had been prescribed a walker, TENS unit, and breathing machine. (Tr. 1227). Nurse Stevens opined that Ms. Ditty could occasionally lift fewer than 20 pounds; stand or walk for a total of 20 minutes in an eight-hour workday; sit for 20 to 30 minutes in an eight-hour workday; occasionally balance; rarely climb, stoop, crouch, kneel, and crawl; occasionally reach and push or pull; and frequently engage in fine or gross manipulation. (Tr. 1226-27). Nurse Stevens also opined that Ms. Ditty experienced moderate pain, which she rated as a six out of ten, and opined that the pain would interfere with Ms. Ditty's concentration and

---

[2] The ALJ found that Ms. Ditty suffered from both physical and mental impairments. In this proceeding, Ms. Ditty challenges only the ALJ's treatment of her physical impairments. Accordingly, the Court limits its summary to evidence regarding those impairments.

ability to remain on task and would result in absenteeism. (Tr. 1227). Nurse Stevens further opined that Ms. Ditty needed to elevate her legs 45 degrees at will and required additional, unscheduled rest periods of 30 minutes to an hour each day. *Id*.

The ALJ found that Nurse Stevens' opinions were not persuasive because many of her opinions were based on Ms. Ditty's subjective complaints. (Tr. 238). The ALJ also found that Nurse Stevens failed to adequately describe the data on which she relied, and that the limitations Nurse Stevens identified were inconsistent with the MRI results on which she relied and with other treatment records. *Id*.

### 2. *David J. Mansour, M.D.*

On December 2, 2021, Dr. Mansour submitted a letter opining that Ms. Ditty was disabled and could not maintain meaningful employment in light of her chronic low back pain, fibromyalgia, COPD with asthma, chronic diarrhea resulting from celiac disease and diverticulosis, PTSD, and major depressive disorder, recurrent episode, moderate. (Tr. 2212).

The ALJ found that Dr. Mansour's opinions were "less persuasive" because the letter was written after Ms. Ditty's date last insured and described Ms. Ditty's current functioning rather than her functioning during the relevant period. (Tr. 238-39). The ALJ further found that Dr. Mansour's opinions were not consistent with Ms. Ditty's treatment records. (Tr. 239) Finally, the ALJ disregarded Dr. Mansour's statement that Ms. Ditty was unable to work because that issue is reserved to the Commissioner. *Id*.

### 3. *State Agency Medical Consultants*

On July 7, 2018, James Cacchillo, D.O., a state agency medical consultant, adopted a prior RFC, opining that Ms. Ditty was limited to light work and could frequently reach overhead with her right upper extremity; frequently climb with her right side; never climb with her left side; frequently stoop, kneel, crouch, and crawl; never be exposed to hazards; and have frequent

exposure to dusts, odors, fumes, and pulmonary irritants. (Tr. 3889). Dr. Cacchillo also opined that Ms. Ditty required frequent access to the bathroom and must be able to use it at will, but that she would not be off-task more than 15% of the workday. (Tr. 389). Finally, Dr. Cacchillo opined that Ms. Ditty was limited to routine workplace changes and could not work at a production rate pace. *Id*. On September 16, 2018, Steve E. McKee, M.D., concurred with Dr. Cacchillo's opinions on reconsideration. (Tr. 402).

The ALJ found that the opinions of the state agency medical consultants were mostly persuasive, but that new and material evidence warranted a departure from the prior RFC on which the state agency medical consultants relied. (Tr. 237). In particular, the ALJ found that Ms. Ditty had experienced some improvement in her gastrointestinal symptoms, which meant that she no longer required at-will access to the bathroom. *Id*. The ALJ also found that evidence from the relevant period did not indicate that Ms. Ditty had manipulative difficulties with her right upper extremity. *Id*. However, the ALJ found that Ms. Ditty's condition had worsened in other respects, including with respect to her back pain and her respiratory issues. *Id*.

### D.    Relevant Medical Evidence

On March 30, 2017, prior to her alleged onset date, Ms. Ditty presented to SouthWest Urology, complaining of urinary incontinence. (Tr. 1661). She reported that she had undergone colon surgery in February 2016 and that her bladder was nicked during the procedure. *Id*. She said that, while the nick was repaired, she required a second surgery, and that she had experienced incontinence issues since that time. *Id*. She reported nocturia and leakage when coughing, laughing, or sneezing. *Id*. She also reported that she had daytime leakage more than seven times per day. *Id*. On May 26, 2017, she reported no improvement in her condition despite new medication. (Tr. 1671). A June 22, 2017 urodynamic evaluation indicated that Ms. Ditty had stress induced detrusor hyperactivity, as well as a low pressure flow and high urethral pressure which

might be due to an obstruction. (Tr. 1678). Ms. Ditty began a bladder treatment program in June 2017, but discontinued the program on August 31, 2017 after she was unable to achieve her goals. (Tr. 854-55).

On June 15, 2017, prior to her alleged onset date, Ms. Ditty was seen by Nurse Stevens at the MetroHealth Department of Physical Medicine and Rehabilitation for a referral regarding her lower back pain. (Tr. 863). She reported intermittent sharp and burning pain that was worse with activity and that radiated down her left leg to her knee. (Tr. 864). Ms. Ditty rated her pain as a four out of ten but said that it could be as bad as a ten out of ten. *Id*. She also reported that she had been falling frequently and said that she felt like her legs were giving out. *Id*. She reported taking gabapentin, ibuprofen, Flexeril, and she also reported using a TENS unit and heating pads. *Id*. On examination, Ms. Ditty displayed a normal range of motion with tenderness at the lumbosacral spinal muscles on the left side. (Tr. 870). She had no evidence of spasm or trigger points, and a straight leg rase test was negative. *Id*. She had normal sensation, motor strength, and fine motor control, and was able to heel walk, toe walk, and tandem gait without difficulty. (Tr. 870-71). She was given Percocet and scheduled for an MRI. (Tr. 871).

Ms. Ditty had a follow-up visit with Nurse Stevens on June 29, 2017. (Tr. 877). She reported that she had fallen again since her last visit and that her pain was getting worse. (Tr. 884). Ms. Ditty also brought disability forms, although she brought the wrong forms. (Tr. 877). Nurse Stevens opined that Ms. Ditty could sit for 30 minutes to an hour with repositioning, stand for 30 minutes, walk 400 feet for fewer than 30 minutes, carry a gallon of milk, and squat with difficulty. *Id*. Ms. Ditty received an injection in her shoulder. (Tr. 884).

On July 3, 2017, Ms. Ditty underwent a cystoscopy. (Tr. 1698). Her bladder and urethra appeared normal with good suspension. *Id*. Ms. Ditty exhibited leakage with coughing. *Id*. She was discharged on antibiotics. *Id*. At a follow-up visit on August 3, 2017, it was noted that her

11

cystoscopy was unremarkable. (Tr. 1674). Her medication was adjusted, and she was referred for a possible repeat procedure. (Tr. 1864).

Ms. Ditty had a physical therapy visit on August 16, 2017. (Tr. 897). She reported that her pain was located in her lower left back and radiated down her left leg to her calf. (Tr. 900). She said that Neurontin and Flexeril alleviated her pain somewhat. *Id*. She also reported experiencing falls. *Id*. On examination, Ms. Ditty exhibited extension bias and joint malalignment with poor lumbar and pelvic stability. (Tr. 901). She had a positive lest straight leg test, labored sit to stand, labored lifting, and an independent gait without the use of an assistive device. *Id*. She was rated as 60% disabled according to the Oswestry back pain score. *Id*. It was noted that she would benefit from physical therapy and that her prognosis was good. *Id*.

On August 21, 2017, Ms. Ditty went to the MetroHealth clinic, complaining of shortness of breath and cough, which she reported had begun six days previously. (Tr. 914). She was positive for congestion, a runny nose, sinus pressure, cough, and wheezing. *Id*. She was diagnosed with COPD exacerbation and given steroids. (Tr. 919). At a follow-up visit on September 5, 2017, Ms. Ditty reported that her condition was unchanged. (Tr. 947). She was prescribed doxycycline, albuterol inhalers and nebulizers, and fluconazole. (Tr. 949-50).

Ms. Ditty attended physical therapy for her back issues from August 21, 2017 through September 11, 2017. (Tr. 907, 927, 934, 957, 964). She reported improving radicular symptoms but continued to complain of constant low back pain, along with limited tolerance for sitting, ambulating, and climbing stairs. (Tr. 966). It was noted that her progression was slow, but that further physical therapy may be beneficial in light of the progress she was making. *Id*.

On September 14, 2017, Ms. Ditty had a follow-up visit at SouthWest Urology. (Tr. 1017). She reported that her incontinence was ongoing and that she was changing her pads eight to ten times per day. *Id*. On October 24, 2017, Ms. Ditty underwent bladder surgery, receiving a sling

lysis and a cystoscopy. (Tr. 1019). On December 12, 2017, Ms. Ditty reported that she was still changing her pads six to eight times per day. (Tr. 1021).

On October 1, 2017, Ms. Ditty presented to University Hospital Parma Medical Center complaining of a cough. (Tr. 1000). She reported that she had developed intermittent right-sided chest pain over the last few days, but denied shortness of breath, edema, or coughing up blood. *Id*. On examination, she did not display any chest pain, shortness of breath, or cough. (Tr. 1001). She had reproduceable tenderness on examination. *Id*. Her breath sounds were clear and normal. *Id*. She was prescribed Levaquin, prednisone, and Hycodan and encouraged to stop smoking. *Id*.

On October 16, 2017, Ms. Ditty underwent an MRI of her lumbar spine, which revealed degenerative disc bulges and facet arthropathy at L4-5 and L5-S1 without neural compression. (Tr. 1577).

On December 7, 2017, Ms. Ditty had a follow-up visit with Nurse Stevens regarding her back issues. (Tr. 1076). She reported that her bladder was worse. *Id*. She also reported that she had to use a wheelchair during a recent visit to Walmart because she was unable to get back to her car. *Id*. Ms. Ditty requested a handicap sticker and stated that she wanted to pay for a walker with a seat. *Id*. She also stated that she was "eating" ibuprofen. *Id*. On examination, she was negative for gait or balance issues and weakness in her extremities. (Tr. 1076-77). She also had a normal range of motion and tenderness at the lumbosacral spinal muscles on the left side without evidence of spasm or trigger points. (Tr. 1080). She had normal sensation in her lower extremities, normal motor strength, and normal fine motor control. (Tr. 1080-81). She was able to heel walk, toe walk, and tandem gait without difficulty. *Id*. She was instructed to decrease the use of Motrin, given a prescription for a rollator walker and a disability placard, and prescribed Percocet and an epidural injection. (Tr. 1081). Ms. Ditty received a rollator walker on December 8, 2017. (Tr. 996). On December 29, 2017, she received a lumbosacral epidural steroid injection. (Tr. 1073).

On March 8, 2018, Ms. Ditty had a follow-up visit with Nurse Stevens. (Tr. 1028). She stated that the epidural steroid injection provided her with only two weeks of relief, and that the injection was not worth the short-term relief. (Tr. 1028). She also reported that Percocet was helping her to manage her pain and said that her pain was controlled. *Id*. She requested Lidocaine patches. *Id*.

On March 20, 2018, Ms. Ditty had a follow-up visit with Dr. Mansour. (Tr. 1052). She reported that she was having an outbreak of her COPD, which began two days prior. *Id*. She reported acute coughing and mucus along with increased wheezing and shortness of breath. *Id*. On examination, she was positive for mild respiratory distress and wheezing. (Tr. 1053). She was instructed to continue fast-acting relievers and to take antibiotics. (Tr. 1053-54).

On March 27, 2018, Ms. Ditty presented to SouthWest Urology for evaluation of an overactive bladder. (Tr. 1852). She reported urgency, problems getting to the bathroom in time, urinating more than once every two hours, and getting up at night to urinate two to three times. *Id*. She reported wearing protective pads and said that she wore more than five pads per day. *Id*. She was given a trial of Vesicare, and it was noted that she would proceed to advanced therapy if that medication failed. (Tr. 1854).

Ms. Ditty underwent pulmonary function testing on April 6, 2018, which revealed a stable, partially reversible, moderate obstructive ventilatory defect consistent with a diagnosis of grade A2 or B2 COPD, more likely than asthma. (Tr. 1050). It was recommended that she consider walking oximetry or pulmonary rehabilitation. *Id*.

On May 25, 2018, Ms. Ditty had a follow-up visit with Dr. Mansour. (Tr. 1580). She complained of heel pain, which she said was worse when she walked or stood for a long time. *Id*. She reported that she was still coughing and wheezing and needed to rest when walking long distances. *Id*. On examination, Ms. Ditty was positive for cough, shortness of breath and wheezing,

but negative for hemoptysis and sputum production. *Id*. She had scattered bilateral rhonchi. *Id*. She also displayed tenderness in her sole. (Tr. 1581). Dr. Mansour stated that Ms. Ditty's COPD was not controlled and that she was not taking medications as planned. (Tr. 1581). He noted that she would be sent to pulmonary rehabilitation. *Id*. He also diagnosed her with plantar fasciitis. *Id*.

On June 7, 2018, Ms. Ditty had another follow-up visit with Nurse Stevens. (Tr. 1204). Ms. Ditty reported that her plantar fasciitis was making her back pain worse and increasing her stiffness. *Id*. She also reported that her pain was getting worse and that she was experiencing an increased number of falls. (Tr. 1209). On examination, Ms. Ditty had normal range of motion, tenderness at the lumbosacral spinal muscles on the left side, no evidence of trigger points or spasm, and a negative straight leg raise test. (Tr. 1209). She had normal reflexes, sensations, and motor strength in her legs, and was able to heel walk, toe walk, and tandem gait without difficulty. *Id*. She did not display any urinary symptoms. *Id*.

On July 6, 2018, Ms. Ditty presented to Brecksville Health and Surgery Center, complaining of pain in her right heel. (Tr. 1572). She was again diagnosed with plantar fasciitis and received a steroid injection in her heel. (Tr. 1575).

On September 4, 2018, Ms. Ditty had a follow-up visit at SouthWest Urology. (Tr. 1695). She reported that her Vesicare prescription had not provided any improvement and that she was continuing to change pads six times per day. *Id*.

On September 6, 2018, Ms. Ditty again saw Nurse Stevens. (Tr. 1191). Ms. Ditty stated that her pain had improved. (Tr. 1196). Nurse Stevens noted that Ms. Ditty had brought "more disability forms." (Tr. 1191). Nurse Stevens said that she would complete the forms, but that she would not do so again without payment. *Id*. Nurse Stevens also noted that it was unlikely Ms. Ditty would be approved for disability. *Id*. Nurse Stevens stated that Ms. Ditty lived with pain and used a walker as needed, had degenerative disc disease, and a limited ability to lift and carry anything

15

above twenty pounds. *Id*. However, Nurse Stevens also stated that Ms. Ditty "is not physically disabled." *Id*. On examination, Ms. Ditty was negative for urinary symptoms. (Tr. 1195). She also displayed normal range of motion, tenderness at the lumbosacral spinal muscles on the left side, and no evidence of spasm or trigger points. (Tr. 1196).

On November 28, 2018, Ms. Ditty presented to MetroHealth, complaining of exacerbation of her asthma. (Tr. 1613). She was given Prednisone and Azithromycin and instructed to take Singulair daily. *Id*. She was also instructed to take Dulera and Flovent no more than twice a day and to use albuterol as a rescue. *Id*.

On November 29, 2018, Ms. Ditty had a follow-up visit with Nurse Stevens. (Tr. 1625). She complained of pain on both sides of her lower back, which she rated as a five out of ten. *Id*. She stated that her pain was worse in the mornings and that her kids had to help her up. *Id*. She presented with no urinary symptoms. (Tr. 1630). Her range of motion was within normal limits and with pain noted. *Id*. Her medications were modified. *Id*.

On December 3, 2018, Ms. Ditty reported that she had seen improvement in her urinary issues following a Botox injection. (Tr. 1866). She said that she was not having the same level of urgency and was not experiencing nocturia. *Id*. She also reported that she was using three protective pads per day, down from the six pads per day she was using before the injection. *Id*.

On February 13, 2019, Ms. Ditty presented to MetroHealth Parma Pulmonary Medicine for a pulmonary consultation. (Tr. 1727-28). It was noted that her COPD was not well controlled. (Tr. 1728).

Ms. Ditty had a follow-up visit with Nurse Stevens on February 28, 2019. (Tr. 1721). She stated that she was doing okay but continued to have pain radiating down both lower extremities. *Id*. She said that the pain did not occur every day but was severe when it did. *Id*. She also reported that steroid injections had not helped at all. *Id*. On examination, she displayed normal range of

16

motion with pain. (Tr. 1726). Her medications were modified. *Id*.

Ms. Ditty underwent additional pulmonary function tests on May 29, 2019. (Tr. 1738). Her FEV1/FVC ratio was decreased. (Tr. 1739). It was noted that her pulmonary function tests were consistent with a severe obstructive ventilatory defect with a significant response to inhaled bronchodilators and that she may be a candidate for pulmonary rehabilitation. (Tr. 1740).

On June 20, 2019, Ms. Ditty saw Dr. Mansour for follow-up, complaining of migraines and possible fibromyalgia. (Tr. 1770). On examination, she was positive for back pain, joint pain, myalgias, and neck pain. *Id*. She was also positive for abdominal pain, constipation, and diarrhea. *Id*. On examination, Ms. Ditty was positive for 16 of 18 fibromyalgia trigger points. (Tr. 1773). She was diagnosed with myalgia, unspecified site and informed that she had fibromyalgia. (Tr. 1774-75).

On July 25, 2019, Ms. Ditty had a follow-up visit with Dr. Mansour. (Tr. 1841). She complained of low back pain, which she reported had started fewer than four weeks previously. *Id*. She stated that the pain was constant but ranged in severity, with a maximum pain of seven to nine out of ten, which occurred most days and limited her function. *Id*. On examination, Ms. Ditty displayed a normal gait, normal rotation, and normal toe and heel walking. (Tr. 1842). She had abnormal flexion and extension. *Id*. She also exhibited normal sensation and reflexes. *Id*. She was diagnosed with myalgia, unspecified site; acute bilateral low back pain with bilateral sciatica; chronic midline low back pain with bilateral sciatica; and degenerative disc disease, lumbosacral. (Tr. 1843). She was prescribed supplemental pain medication, muscle spasm medication, and a back brace. *Id*.

Ms. Ditty underwent additional pulmonary function tests on August 7, 2019. (Tr. 1947). Ms. Ditty showed a decreased FEV1/FVC ratio, which was only 37% of the predicted value. *Id*. However, the accuracy of the test was limited because Ms. Ditty used a bronchodilator one hour

prior to testing. *Id*. Based on the severity of Ms. Ditty's lung disease, it was recommended that she undergo testing oximetry to determine the need for home oxygen supplementation. *Id*. At a follow-up visit on September 11, 2019, Ms. Ditty reported continuing wheezing with a dry hacking cough. (Tr. 1982).

Ms. Ditty had a follow-up appointment at SouthWest Urology on September 20, 2019. (Tr. 1858). She reported that the prior Botox injections had given her relief for eight months, and another injection was planned. (Tr. 1858, 1860). It was noted that her gait was normal. (Tr. 1860).

On October 3, 2019, Ms. Ditty underwent an exercise oximetry study. (Tr. 1966). Her oxyhemoglobin saturation remained at or above 92% while walking. *Id*. It was determined that she did not require supplemental oxygen while at rest or during low-level activities. (Tr. 1967).

Ms. Ditty received another Botox injection on October 11, 2019. (Tr. 1877). On October 29, 2019, she reported good response to the injection, improvement in frequency, and an absence of side effects. (Tr. 1872). On January 14, 2020, Ms. Ditty reported that she was doing well with occasional bouts of frequency and urgency. (Tr. 1873). On April 3, 2020, Ms. Ditty again reported that her frequency and urgency were improved. (Tr. 1874). On November 6, 2020, after her date last insured, Ms. Ditty had another Botox injection. (Tr. 2053). She reported that the prior injection had been effective for eight months. *Id*. On February 19, 2021, Ms. Ditty reported that her symptoms had recurred following her last Botox injection. (Tr. 2205). She received another injection. *Id*.

On November 4, 2020, Ms. Ditty underwent a colonoscopy. (Tr. 2021). It was noted that she had a history of loose stools. *Id*. Biopsies were taken, and a four-millimeter polyp was removed from her descending colon. (Tr. 2022). On November 19, 2020, Ms. Ditty presented to MetroHealth for a follow-up regarding her chronic diarrhea. (Tr. 2036). She reported that she had experienced diarrhea for more than four weeks and said that she was having episodes twenty to

thirty times per day. (Tr. 2038). On November 24, 2020, Ms. Ditty was diagnosed with celiac disease. (Tr. 2063).

## IV.    THE ALJ'S DECISION

The ALJ first determined that Ms. Ditty met the insured status requirements of the Social Security Act through September 30, 2020, but not thereafter. (Tr. 220). The ALJ also determined that Ms. Ditty had not been engaged in substantial gainful activity from her alleged onset date of November 23, 2017 through her date last insured. (Tr. 221).

The ALJ next determined that Ms. Ditty had the following severe impairments: chronic obstructive pulmonary disease (COPD); asthma; degenerative disc disease; right shoulder impingement; migraines; irritable bowel syndrome (IBS); anxiety disorder; posttraumatic stress disorder (PTSD); and depressive disorder. *Id*. The ALJ found, however, that none of Ms. Ditty's severe impairments, whether singly or in combination, met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 222). In reaching that finding, the ALJ expressly rejected Dr. Goldstein's testimony that Ms. Ditty's back condition equaled Listing 1.15. (Tr. 223).

The ALJ next determined that Ms. Ditty had the residual functional capacity ("RFC") to:

> perform light work as defined in 20 CFR 404.1567(b) except as follows: She could have lifted and/or carried 20 pounds occasionally and 10 pounds frequently; she could have climbed ramps and stairs occasionally; she could never have climbed ladders, ropes, or scaffolds; she could have stooped, kneeled, crouched, and crawled occasionally; she should not have worked at unprotected heights or operated dangerous moving machinery, such as power saws and jack hammers; and she should have avoided all work that has environmental elements of working in humidity, wetness, pulmonary irritants, extreme cold, and extreme heat. She could have understood, remembered, and carried out instructions for work tasks that did not have production rate pace requirements, i.e., no hourly piece rate work. She could have adapted to occasional changes in work duties.

(Tr. 229).

The ALJ next determined that Ms. Ditty was capable of performing her past relevant work as a display manager. (Tr. 239). Accordingly, the ALJ determined that Ms. Ditty is not disabled. (Tr. 240).

## V.    LAW & ANALYSIS

### A.    <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quotation omitted). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation omitted).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec*., 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by

substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

**B.    Standard for Disability**

To establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

Consideration of disability claims follows a five-step review process. 20 C.F.R. §404.1520. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work

experience. *See* 20 C.F.R. § 404.1520(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 404.1520(e). At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in significant numbers in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1520(g) and 404.1560(c). *See Abbott*, 905 F.2d at 923.

### C.  **Analysis**

Ms. Ditty argues that the ALJ committed reversible error in three respects: (1) rejecting Dr. Goldstein's opinion that Ms. Ditty's back condition medically equaled Listing 1.15 and failing to properly evaluate Nurse Stevens' opinion; (2) failing to credit Ms. Ditty's subjective complaints regarding her symptoms and their impact on her ability to work; and (3) omitting Ms. Ditty's need for a walker from the RFC. Ms. Ditty's argument that the ALJ erred in evaluating Dr. Goldstein's opinion is well taken, and the Court therefore does not reach her remaining arguments.

Because Ms. Ditty filed her disability claim after March 27, 2017, the "treating physician" rule, pursuant to which an ALJ was required to give controlling weight to an opinion from a treating physician absent good reason not to, does not apply. *See* 20 C.F.R. § 404.1527; *Merrell v. Comm'r of Soc. Sec.*, 1:20-cv-769, 2021 WL 1222667, at *6 (N.D. Ohio Mar. 16, 2021), *report and recommendation adopted*, 2021 WL 1214809 (N.D. Ohio Mar. 31, 2021). Instead, the current regulations stated that the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a).

The SSA considers opinions from medical sources under five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as familiarity with other evidence in the claim or with the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). Section 404.1520c(b)(1) specifically provides that "it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [the ALJ] considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b)(1). Of the five factors, supportability and consistency are the most important, and an ALJ must explain how the ALJ considered them. 20 C.F.R. § 404.1520c(b)(2). The ALJ "may" but "is not required to" explain how the ALJ considered the remaining factors. *Id*.

The "supportability" factor looks to how well the medical source supports the opinion with objective medical evidence from the record. *See* 20 C.F.R. § 404.1520c(c)(1). The "consistency" factor looks to how consistent the medical opinion is with evidence from other medical and nonmedical sources. *See* 20 C.F.R. § 404.1520c(c)(2). "As long as the ALJ discussed the supportability and consistency of the opinion and supported [the ALJ's] conclusions with substantial evidence within his decision, the Court will not disturb [the ALJ's] decision." *Njegovan v. Comm'r of Soc. Sec. Admin*., No. 5:21-CV-00002-CEH, 2022 WL 1521910, at *4 (N.D. Ohio May 13, 2022).

Here, the ALJ retained Dr. Goldstein as an impartial medical expert following the Appeals Council's second remand order, which instructed the ALJ to obtain a medical consultant in light of new test results showing that Ms. Ditty's pulmonary functioning had continued to decline. (Tr. 457). With respect to that issue, Dr. Goldstein testified that Ms. Ditty did not meet or equal Listing 3.02 (Chronic Respiratory Disorders) or Listing 3.03 (Asthma) because her FEV tests were not less than or equal to the required values given her height. (Tr. 260). The ALJ accepted Dr.

Goldstein's testimony on that issue (Tr. 226), and Ms. Ditty does not challenge the ALJ's decision to do so in this proceeding. The ALJ also found that Dr. Goldstein's testimony was persuasive to the extent he opined that Ms. Ditty should avoid pulmonary irritants (Tr. 236), a finding that Ms. Ditty again does not challenge.

Dr. Goldstein also opined, however, that Ms. Ditty's back condition equaled Listing 1.15, the listing for disorders of the skeletal spine. (Tr. 261). In addition, he testified that Ms. Ditty's back condition imposed a number of functional limitations, including that she could not stand or walk for more than two to three hours per workday; would need to alternate between sitting and standing every 45 to 60 minutes; could experience pain while sitting; would require additional breaks during the day; should avoid kneeling, crawling, or bending; should not climb more than one set of stairs; and should avoid unprotected heights. (Tr. 272).

The ALJ rejected Dr. Goldstein's opinions with respect to Ms. Ditty's back condition and her associated limitations on several grounds, including that: (1) his assertion that Ms. Ditty required a walker due to her back condition was in error because her pain more likely arose from her plantar fasciitis; (2) orthopedics is not his area of medical expertise; (3) the severe limitations Dr. Goldstein identified were not consistent with Ms. Ditty's longitudinal medical history; and (4) the opinions of the state agency medical examiners were more persuasive. (Tr. 223-25, 236). The ALJ's first reason for rejecting Dr. Goldstein's opinion failed to apply appropriate legal standards and necessitates remand.

"It is well-established that an ALJ may not play doctor by making medical judgments." *Herbert v. Comm'r of Soc. Sec.*, No. 1:22-cv-00533, 2023 WL 6155984, at *3 (N.D. Ohio Sept. 21, 2023); *see also Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006). "Although the ALJ may 'assess [] the medical . . . evidence before rendering a residual functional capacity finding,' she crosses a line if she 'substitutes [her] knowledge for that of a physician or medical expert and

interprets raw medical data." *Herbert*, 2023 WL 6155984 at *3 (citing *Poe v. Comm'r of Soc. Sec*., 342 F. App'x 149, 157 (6th Cir. 2009); *Fowler v. Comm'r of Soc. Sec.*, No. 1:21-cv-01708, 2022 WL 3648436, at *13 (N.D. Ohio Aug. 9, 2022), *report and recommendation adopted*, 2022 WL 3647771 (N.D. Ohio Aug. 24, 2022)); *see also Furlong v. Comm'r of Soc. Sec. Admin*., No. 1:22-CV-00588-BMB, 2023 WL 2987821, at *9 (N.D. Ohio Feb. 17, 2023) ("it is tantamount to playing doctor for the ALJ to substitute her own medical opinion for that of medical professionals when considering the same medical evidence"), *report and recommendation adopted*, 2023 WL 4931930. Thus, "a remand is appropriate . . . where 'the ALJ interpreted raw medical data on [her] own, rather than accepting medical opinions of record or consulting a ME.'" *Nimrod v. Kijakazi*, No. 1:20-cv-00678, 2021 WL 4291224, at *9 (N.D. Ohio Sept. 21, 2021) (quoting *Young v. Comm'r of Soc. Sec.*, No. 1:10-cv-2900, 2012 WL 4505850 (N.D. Ohio Sept. 28, 2012), *report and recommendation adopted*, 2010 WL 1254833 (N.D. Ohio Mar. 25, 2010)).

The ALJ violated that rule here. The ALJ did not merely find that Dr. Goldstein's opinion was unsupported and/or inconsistent with other evidence in the record. Instead, the ALJ determined that Dr. Goldstein's medical diagnosis was inaccurate based on the ALJ's independent interpretation of Ms. Ditty's medical records. Specifically, the ALJ found that Dr. Goldstein was wrong in concluding that Ms. Ditty's pain and need for a walker were related to her back condition, concluding that Ms. Ditty's symptoms "were not due to degenerative disc disease. Instead, they were more likely due to her plantar fasciitis." (Tr. 223).

The ALJ then engaged in an analysis of Ms. Ditty's medical records, concluding that the treatment notes prescribing a walker for Ms. Ditty "should not be considered in a vacuum." *Id*. Rather, the ALJ found that a "more careful review" of Ms. Ditty's treatment records "did not show evidence of neural compression and degenerative change was characterized as no more than moderate in severity." *Id*. The ALJ further stated that "imaging results suggest pathology capable

of causing pain and warranting restrictions; however, the characterized severity of such pathology, along with the lack of demonstrated cord compromise, would not typically be associated with the need for the use of a wheelchair or seated walker." (Tr. 223-24). The ALJ also found that "the difficulties the claimant reported in December 2017 appear to be more focused on pain and dysfunction related to plantar fasciitis which was initially diagnosed by her primary care physician, Dr. Mansour, subsequently." (Tr. 224).

Neither the ALJ nor this Court is qualified to make an independent judgment regarding whether Ms. Ditty's pain and her request for an assistive device were caused by plantar fasciitis or by her back condition. Nor was it proper for the ALJ to conduct a "more careful review" of the medical records to determine whether Dr. Goldstein's diagnosis was in error. Likewise, the ALJ was not qualified to determine on her own whether imaging results of Ms. Ditty's spine suggested a condition severe enough to require the use of a wheelchair or a walker. Because the ALJ did not apply proper legal standards in evaluating Dr. Goldstein's opinions, and instead made independent medical judgments, remand is warranted. *See Herbert*, 2023 WL 6155984 at *3 (holding that ALJ impermissibly played doctor by "relying on her own lay interpretation of medical data to disregard the state doctors' opinions"); *Furlong*, 2023 WL 2987821 at *9 (holding that ALJ impermissibly played doctor where ALJ rejected state agency medical examiners' opinions based on ALJ's own interpretation of evidence state agency medical examiners had already considered); *Mascaro v. Colvin*, No. 1:16CV0436, 2016 WL 7383796, at *11 (N.D. Ohio Dec. 1, 2016) ("Neither the ALJ nor this Court has the medical expertise to conclude whether a grossly intact neurological exam or an absence of 'erythema' necessarily rules out the disabling condition to which Dr. Smith opined."), *report and recommendation adopted sub nom*, 2016 WL 7368676.

The ALJ also rejected Dr. Goldstein's opinions on other grounds, including that (1) Dr. Goldstein is not an orthopedist; and (2) other treatment records do not reflect that Ms. Ditty was

using an assistive device. The Commissioner vigorously defends the ALJ's findings with respect to those issues. However, the Court cannot determine from reading the decision whether the ALJ's findings on those other issues were influenced by the ALJ's conclusion that Ms. Ditty's prescription for a walker arose from her plantar fasciitis rather than her back condition. Accordingly, remand is warranted so that the ALJ can consider Dr. Goldstein's opinion without making independent medical judgments regarding whether Ms. Ditty's prescription for an assistive device resulted from her back condition or her plantar fasciitis. On remand, the ALJ is, of course, free to analyze the supportability and consistency of Dr. Goldstein's opinion in accordance with the Social Security regulations, and nothing in this order should be interpreted as a ruling on those issues.[3]

## VI.    CONCLUSION

Based on the foregoing, the Court VACATES the Commissioner's decision and REMANDS this case to the Commissioner for further proceedings consistent with this memorandum opinion and order.

**IT IS SO ORDERED.**

Dated: March 4, 2025

*/s Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

---

[3] In light of the Court's conclusion that remand is warranted with respect to the ALJ's evaluation of Dr. Goldstein's opinion, the Court does not reach Ms. Ditty's remaining assignments of error.